### In re: SOUTHERN OHIO CORRECTIONAL FACILITY

Darrin E. Morris and Eugene K. Adams, Plaintiffs–Appellees,

v.

Arthur Tate, Jr., Warden; George V. Voinovich, Governor; Reginald Wilkinson; Terry Collins; Eric Dahlberg; and Ben Bower, Defendants

Cuyahoga County Commissioners; Cuyahoga County Child Support Enforcement Agency; Cuyahoga County Clerk of Courts, Proposed Intervenors–Appellants.

No. 00–3454, 00–3455, 00–3090.

United States Court of Appeals, Sixth Circuit.

Dec. 26, 2001.

---

Before MERRITT, NELSON, and SUHRHEINRICH, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

These are appeals from district court orders entered in the wake of the $4.1 million settlement of a prisoner class action arising from the riot that occurred at the Southern Ohio Correctional Facility at Lucasville, Ohio, in 1993. For background on the settlement, see *In re Southern Ohio Correctional Facility*, 173 F.R.D. 205 (S.D.Ohio 1997).

The order at issue in Case No. 00–3090 granted "incentive awards" of $7,500 to each of the two named plaintiffs, Darren Morris and Eugene Adams. The orders at issue in Case No. 00–3455 are protective orders that barred public disclosure of documents consisting of (1) completed claim forms and related evidentiary materials filed with a court-appointed special master/claims administrator by individual members of the plaintiff class, (2) responsive materials filed by the state, (3) claim determinations by the administrator, and (4) claimant appeals from such determinations. The order at issue in Case No. 00–3454 denied an intervention request filed by various local agencies in Cuyahoga County, Ohio, in an effort to facilitate the collection of debts owed by certain class members.

Upon review, we conclude that the settlement agreement did not provide for a grant of incentive awards and that the district court exceeded its authority in approving such awards. We further conclude that the breadth of the challenged protective orders is not supported by the record. Finally, we conclude that the Cuyahoga County entities failed to satisfy the requirements of Fed.R.Civ.P. 24(a) for intervention as of right; the denial of such intervention will be affirmed.

I

A

The 1993 riot at the Southern Ohio Correctional Facility was the longest and third deadliest prison uprising in United States history. It prompted the filing of the present class action, in which damages and injunctive relief were sought on behalf of inmates who had not committed illegal acts in the disturbance and whose constitutional rights had allegedly been violated by the state.

On December 2, 1994, the district court certified the case as a class action under Fed.R.Civ.P. 23(b)(2). After more than two years of negotiations and a summary jury trial, the parties agreed to settle the dispute. On January 22, 1997, the parties signed an agreement styled "Class Action Memorandum of Understanding." Among other things, the Memorandum of Understanding mandated the creation of a $4.1 million settlement fund from which claims of individual class members were to be paid on the recommendation of the claims administrator. Any residual amount left in the settlement fund after payment of all

valid claims was to be used for "inmate programming."

The parties also negotiated general procedures for the administration and distribution of the settlement fund. The agreement as to procedure was memorialized in a separate document entitled "General Protocol for Claims by Class Members Against Settlement Fund." The Memorandum of Understanding and the General Protocol (collectively, the "settlement agreement") embodied the complete understanding between the parties. On January 30, 1997, the district court preliminarily approved the settlement and ordered that notice of the proposed agreement be sent to the class members.

On March 3, 1997, counsel for the class submitted a request for fees and expenses. The list of claimed expenses included "incentive awards" in the amount of $25,000 apiece for the two named plaintiffs. The state objected to the payment of such awards, as did two class members. The district court deferred ruling on the question of incentive awards until completion of a fairness hearing that had been scheduled for April 15, 1997.

The fairness hearing was duly held, after which, on April 22, 1997, the district court granted final approval to the settlement. See *In re Southern Ohio Correctional Facility*, 173 F.R.D. at 212–215. Although the court approved the recovery of $1.4 million in attorney fees and $258,613.41 in expenses, the issue of incentive awards was left unresolved as an "administrative detail concerning the enforcement of the Settlement." *Id.* at 215.

In July of 1997 the district court held in principle that the two named plaintiffs should receive incentive awards. See *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270 (S.D.Ohio 1997) (order). The court did not set the amount of the awards, but asked for a recommendation on this subject from the claims administrator. See *id.* at 276. In the same order, the district court expressed reservations about the manner in which the request for incentive awards had been made and the fact that members of the class had not been apprised of the request before the fairness hearing. See *id.* at 277. Accordingly, the court decided that the incentive awards would not be deducted from the amount remaining to be divided but would instead be taken from the funds already set aside for attorney fees and expenses. See *id.*

The defendants appealed the grant of incentive awards, but this court dismissed the appeal as premature because the amount had not yet been determined. See *In re Southern Ohio Correctional Facility*, No. 97–3982 (6th Cir. March 23, 1998) (unpublished order).

In an order dated December 29, 1999, the district court approved a recommendation by the claims administrator that the two class representatives be paid $7,500 apiece. See *In re Southern Ohio Correctional Facility*, No. C–1–93–436 (S.D.Ohio Dec. 29, 1999) (order). The stated basis for these awards was that "the class representatives performed important work on behalf of the other members of class and class counsel," serving as a "crucial link for class members and counsel throughout the proceedings" and keeping the "class members generally informed in the progress of the case and relay[ing] information back to class counsel." *In re Southern Ohio Correctional Facility*, No. C–1–93–436 (S.D.Ohio Dec. 16, 1999) (recommendation of special master to grant incentive awards). In a subsequent order, the district court stayed its grant of incentive awards pending appeal. See *In re Southern Ohio Correctional Facility*, No. C–1–93–436 (S.D.Ohio Feb. 28, 2000) (order).

## B

While the issue of incentive awards was being considered, the process of adjudicating individual claims against the settlement fund was set in motion. Under this process the claims administrator was to distribute claim forms for completion by members of the class. Claimants were required to detail the nature and amount of their claims and provide supporting documentation from such records as prison staff reports, incident reports, inmate medical records, independent medical records, infirmary logs, disturbance logs, hospital records, photos, videotapes, inmate title records, property room records, court of claims case records, and prison grievance forms. The state was to be provided with a complete copy of each claim submission and was to be given an opportunity to file a response that might also include relevant documentation. Each claimant was to receive a copy of the response, as was class counsel, and an opportunity to reply was provided. The claims administrator was then to adjudicate the claims on the basis of the materials in the claim files. After the administrator issued a determination, both the claimant and the state had a right to appeal to a magistrate judge, in the first instance, and then to the district court.

The parties were concerned that if the identity of successful claimants became known, the claimants might be subject to extortion by fellow inmates. This problem was addressed as follows in ¶ 9 of the General Protocol:

> "Each class member approved for payments shall be identified only by his claim number created for this litigation. No inmate receiving funds from the settlement fund shall be identified by name in any public filing with the Court. A key to the claim numbers assigned will be filed with the Court *in camera.*"

Paragraph 9 is the only provision in either the General Protocol or the Memorandum of Understanding that specifically dealt with confidentiality.

In the summer of 1998 the administrator sent out 1,069 claim forms. A total of 1,055 class members submitted individual claims. The state responded to many of the claims, the responses often incorporating materials such as excerpts from testimony in criminal trials and documents generated in connection with internal prison disciplinary proceedings.

The claims administrator issued his determinations of the individual claims on December 16, 1999. At that time he filed three sets of documents with the district court: (1) a key to the identity of the claimants pursuant to ¶ 9 of the General Protocol; (2) sample forms and a report on the claims process as a whole; and (3) a recommendation for incentive fee awards for the two class representatives. Individual claim determinations were sent to the inmates and to the Attorney General's Office, but were not yet presented to the district court.

When the claims key and incentive award recommendation were given to the clerk of the district court for filing, they were enclosed in sealed envelopes bearing protective orders issued by the magistrate judge. The state promptly moved to vacate the protective orders. Plaintiffs' counsel filed a response agreeing that no protective order should have been issued for the incentive awards recommendation but defending the propriety of the protective order covering the claims key. In addition, plaintiffs' counsel argued that the claim determinations and related evidentiary material should be kept confidential. These matters were discussed with the court at a status conference held on December 23, 1999, at which time the claims administrator explained the process that

had been followed and cleared up some misunderstandings as to what had actually been filed under seal.

On January 10, 2000, the district court lifted the protective order on the incentive award recommendation. See *In re Southern Ohio Correctional Facility*, No. C–1–93–436 (S.D.Ohio Jan. 10, 2000) (order). The individual claim determinations were ordered to be sealed in the interest of inmate safety, however, and, without objection from the state, the protective order was maintained on the claims key. *Id.* It was further provided that any person or organization seeking to review the sealed records (as at least one news organization had asked to do) should first attempt to obtain permission from the parties; if permission were not forthcoming, the organization could apply to the court for permission to release the disputed information. See *id.*

The parties were unable to agree on how media requests should be handled, and the state sought reconsideration of the January 10 order. The plaintiffs opposed reconsideration, filing a brief accompanied by the claim determinations for five inmates and identical affidavits from these inmates. Each of the duplicate affidavits said that the affiant opposed public release of his claim determination out of fear for his safety and personal well being; asserted that the determination contained information from which other inmates could identify him; and concluded that "[t]hose inmates pose a threat to my safety if they learn the amount of my award."

In response to these filings the district court issued an order broadening the scope of the previous orders. Stating that the "safety interests of the inmates, witnesses, and prison personnel outweigh[ed]

the public's right to know," the district court both declined to lift the protective order on the claim determinations and, for the first time, placed under seal the inmates' claim forms, the attachments to the claim forms, the state's responses to the claim forms, and the claimants' appeal letters. See *In re Southern Ohio Correctional Facility*, No. C–1–93–436 (S.D.Ohio Feb. 28, 2000) (order). All individual claim material was thus shielded from public scrutiny. The court did allow any organization seeking access to the claim determinations to obtain redacted copies of the claims administrator's determinations, at the organization's expense, if approved by both plaintiffs' counsel and the state. See *id.*

C

On January 24, 2000, various Cuyahoga County officials and agencies—including the Cuyahoga County Commissioners, the Cuyahoga County Child Support Enforcement Agency, and the Cuyahoga County Clerk of Courts (collectively referred to as Cuyahoga County)—filed a motion for intervention as of right or, in the alternative, for permissive intervention. The county wished to have class members' forthcoming settlement awards applied against unsatisfied judgments that had been rendered for court costs and child support.

The district court denied both branches of the motion to intervene. See *In re Southern Ohio Correctional Facility*, No. C–1–93–436 (S.D.Ohio Feb. 28, 2000) (order).[1] Cuyahoga County filed a notice of appeal on March 24, 2000, limiting its challenge to the denial of intervention as of right. On the same day, the county filed a motion to stay distribution of the settle-

---

1. The same order denied several other counties' motions to intervene as well. Only Cuya-
hoga County has appealed.

ment funds pending appeal. The motion was denied. See *In re Southern Ohio Correctional Facility*, Case No. 00–3454 (6th Cir. Sep. 20, 2000) (unpublished order).

### D

The state raises two issues for our review: (1) whether the district court erred in granting incentive awards to the two named plaintiffs, and (2) whether the district court erred in placing the claim documents under seal. Cuyahoga County raises a single issue: whether the district court erred in finding that the requirements for intervention as of right under Fed.R.Civ.P. 24(a) had not been met. We shall address the issues in the sequence indicated.

### II

### A

Incentive awards are relatively recent but increasingly popular phenomena that

have been justified by some courts as a means of compensating named plaintiffs for the services they provide and the risks they incur in leading class action litigation.[2] Several district courts within this circuit have approved such awards, see, *e.g.*, *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250–51 (S.D.Ohio 1991), and *In re Dun & Bradstreet Credit Serv. Customer Litigation*, 130 F.R.D. 366, 373–374 (S.D.Ohio 1990), as have the Seventh and Ninth Circuit Courts of Appeals. See *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 463 (9th Cir.2000) (affirming grant of incentive awards in securities class action), and *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir.1998) (approving incentive award in an ERISA class action).

This court has not previously been called upon to approve a grant of incentive awards,[3] and we intimate no view as to the propriety of such awards in general. The

---

**2.** An analysis of all class actions terminated between July 1, 1992, and June 30, 1994, in four districts, the Eastern District of Pennsylvania, the Southern District of Florida, the Northern District of Illinois, and the Northern District of California, found that incentive awards were granted in 26 %, 46 %, 40 %, and 37 % of the cases, respectively. The median amounts of all awards to class representatives in the four districts were $7,500 in E.D. Pa. and N.D. Ill., $12,000 in S.D. Fla., and $17,000 in N.D. Cal. See Thomas E. Willging, Laural L. Hooper, Robert J. Niemic, *An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges*, 71 N.Y.U.L.Rev. 74, 101 (1996).

Incentive awards have sometimes been criticized as creating a potential for collusion; if named plaintiffs stand to receive special awards, it has been suggested, they may be more amenable to settling an action to the detriment of the class as a whole. Some courts have denied incentive awards out of a fear that a slippery slope will result where incentive awards, or "bounties," become the norm rather than the exception. See, *e.g.*, *In re Gould Sec. Litig.*, 727 F.Supp. 1201, 1209

(N.D.Ill.1989); *Weseley v. Spear, Leeds & Kellogg*, 711 F.Supp. 713 (E.D.N.Y.1989).

**3.** Class counsel contend, and the district court seemed to agree, that the "theory" behind incentive awards was approved by this circuit in *Thornton v. East Texas Motor Freight*, 497 F.2d 416, 420 (6th Cir.1974). *Thornton* was a class action filed by employees of the East Texas Freight Company under Title VII of the Civil Rights Act of 1964. The district court in that case found that the company's policy of not permitting "city drivers" to transfer to the position of "road drivers" was racially motivated. In granting injunctive relief, the district court decided that black city drivers who had specifically requested a transfer or who had filed a charge with the Equal Employment Opportunity Commission were entitled, upon transfer to a road position, to have their seniority commence six months after the date of the request but not earlier than January 2, 1966. Other black city drivers were held, upon later transfer, to be entitled to less favorable seniority rights. We affirmed, stating, in dicta, that "[w]e also think there is something to be said for rewarding those

only question before us here is whether incentive awards are permissible under the particular settlement agreement entered into between the state and the plaintiffs in this case. We conclude that this question must be answered in the negative.

Four paragraphs in the Memorandum of Understanding spell out the circumstances under which disbursements may be made from the settlement fund. First, the pertinent part of ¶ 43 provides as follows:

"A class member, or an administrator or executor on behalf of a deceased class member's estate, shall be permitted to present claims and receive compensation from the Fund only if the class member making the claim, or on whose behalf the claim is being made, was (1) murdered during the riot; (2) physically injured during the riot; or (3) lost property during or as a consequence of the riot.... The Magistrate may award compensation to a class member outside of the three categories listed in this paragraph only upon a showing by the class member that he has suffered any other serious riot-related injury ...."

Second, ¶ 57 of the Memorandum of Understanding limits the payment of costs from the fund. Paragraph 57 states: "Except as otherwise specifically provided for in this Memorandum, no party shall be liable for any costs or expenses incurred by or on behalf of any other party in connection with this Memorandum." Third, ¶ 47 provides:

"Subject to the approval of the Court after submission of an application(s) for payment of attorneys fees and expenses by Class Counsel, attorneys fees and expenses shall be paid to Class Counsel to reimburse Counsel for the fees and expenses incurred in the prosecution of this action, any appeal of this settlement, and the administration of this settlement."

Finally, ¶ 46 provides that if the settlement fund is not exhausted following the payment of claim awards, fees, and expenses, any remainder shall be spent on inmate programming agreed upon by the parties.

In a previous appeal herein, *In re Southern Ohio Correctional Facility*, No. 97–4491, 191 F.3d 453, 1999 WL 775830 (6th Cir. Sept.24, 1999) (unpublished), we reversed a district court order that would have permitted class members to assign their awards to third parties. "Although neither the Memorandum of Understanding nor the General Protocol specifically prohibit such designations," we observed,

---

drivers who protest and help to bring rights to a group of employees who have been the victims of discrimination." *Id.*

A fair reading of *Thornton* does not compel the conclusion that named class action plaintiffs, who are presumed to work harder and incur more risk than other class members, deserve a financial reward. In the incentive award context, all class members are similarly situated before the filing of the action. Named plaintiffs are rewarded for filing the lawsuit and for what they do during the course of the litigation. The same cannot be said of the drivers in *Thornton*—one group of drivers had pursued a transfer before the litigation began, while a second group had not done so. The order rewarding the first group by granting them more seniority sim-

ply recognized that but for the company's discriminatory conduct, those drivers would have received their requested transfers and have attained a higher level of seniority in the road position than those who had not requested a transfer. For those who had never requested a transfer, moreover, the date from which their seniority should run could not be ascertained with certainty. The district court's disparate treatment of the two groups was not based on one group having been the named plaintiffs in the class action; it simply recognized the differences between the groups and ordered relief accordingly. Our opinion in *Thornton*, except perhaps in a strained reading of its dicta, did no more than approve the district court's fair-minded resolution.

"they do not authorize them either." *Id.* at 6. Accordingly, we concluded, "by authorizing designation of third parties as recipients of the awards, the district court added a term to the compromise struck by the parties" and "impermissibly altered the terms of the settlement, acting beyond the scope of its authority." *Id.* See also *Evans v. Jeff D.,* 475 U.S. 717, 726–27, 106 S.Ct. 1531, 89 L.Ed.2d 747 ("Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed"); *Brown v. County of Genesee,* 872 F.2d 169, 173 (6th Cir.1989) ("It is well established that a 'court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement'" (quoting *Brock v. Scheuner Corp.,* 841 F.2d 151, 154 (6th Cir.1988))); *Walitalo v. Iacocca,* 968 F.2d 741, 750 (8th Cir.1992) ("By imposing liability on [the defendant] for expenses not within the definition of 'costs,' the court impermissibly altered the parties' settlement agreements").

As the district court recognized in the order now before us, the payment provisions of the settlement agreement "[do] not specifically provide that incentive awards are to be made to the named Plaintiffs." *In re Southern Ohio Correctional Facility,* 175 F.R.D. 270 (S.D.Ohio 1997) (order). Invoking ¶ 47, however, the district court concluded that "compensation to a class representative over and above what he may be entitled to as a class member can fairly be characterized as a litigation expense which is recoverable from a common fund created for the benefit of the entire class." *Id.*

■ We respectfully disagree. Paragraph 47 provides that "expenses shall be paid to Class Counsel to reimburse Counsel for the ... expenses incurred in the prosecution of this action ...." This provision contemplates the making of payments (1) to class counsel, (2) to reimburse counsel, (3) for expenses incurred by counsel. The incentives do not fit the agreed template; they are to be paid (1) to class representatives, (2) to reward the representatives, (3) for the representatives' participation in the lawsuit and for non-pecuniary risks they incurred.

Incentive awards, moreover, do not fit comfortably within the commonly accepted meaning of "expenses." Webster's Third New International Dictionary (1981) defines an expense as, alternatively, "something that is expended in order to secure a benefit or bring about a result;" "the financial burden involved typically in a course of action or manner of living;" "the charges that are incurred by an employee in connection with the performance of his duties and that typically include transportation, meals, and lodging while traveling;" "an item of outlay incurred in the operation of a business enterprise allocable to and chargeable against revenue for a specific period;" and "loss, injury, or detriment as the necessary price of something gained or as the inevitable result or penalty of an action." The idea common to these definitions is that of a pecuniary cost or necessary price.

Under the facts of this case, at least, incentive awards bestowed on class representatives as a matter of grace after the completion of the representatives' services do not constitute the "necessary price" of such services. Neither do the awards cover pecuniary costs. The district court justified the awards not on the basis of any monetary expenditures made by the named plaintiffs, but on the basis of these plaintiffs' non-pecuniary risks and their long-time leadership roles and communica-

tion functions. See *In re Southern Ohio Correctional Facility,* 175 F.R.D. 270 (S.D.Ohio 1997) (order). At oral argument, similarly, plaintiffs' counsel pointed to the valuable public service these men were said to have provided in lowering the risk of a recurrence of rioting at the Southern Ohio Correctional Facility. It does not seem to us that rewarding such a service with a cash payment can properly be equated with the reimbursement of "expenses" in any traditional sense of the word.

The plaintiffs argue that it had become settled practice in the Southern District of Ohio for incentive awards to be treated as expenses. The support offered for this assertion consists of unpublished orders in two cases: (1) *In re Fernald Litigation,* No. C–1–85–149 (S.D.Ohio, Dec. 12, 1994), and (2) *Day v. NLO, Inc.,* No. C–1–90–67 (S.D.Ohio, May 19, 1995). These orders are found in no electronic data base, as far as we are aware, and we have no reason to suppose that the state knew of the existence of the orders when the settlement agreement was negotiated in the case at bar. The defendants in the *NLO* case did not oppose the request for the awards, moreover, and neither order persuades us that the settlement agreement in the instant case should be given a meaning broader than that suggested by its plain language.

The plaintiffs also argue that we should be guided by *In re Continental Illinois Sec. Litig.,* 962 F.2d 566 (7th Cir.1992), a securities class action where the named plaintiff challenged a district court's refus-

al to grant an incentive award. In affirming the denial of the award, the Seventh Circuit analyzed the threshold question of whether a named plaintiff can ever recover a fee. The court answered in the affirmative, concluding that "[s]ince without a named plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses, such as long-distance phone calls, which are reimbursable [under the common fund doctrine]." *Id.* at 571. But however incentive awards may be conceptualized in the absence of a settlement agreement, payment of the awards at issue here can only be sustained if authorized by the parties' contract. For the reasons already given, we do not believe that payment of incentive awards was so authorized.[4]

### B

As to the disputed protective orders, the state argues that the orders improperly expanded the limited confidentiality provision that was part of the settlement agreement. Invoking the First Amendment and our long tradition of public access to judicial records, the state further argues that the orders are defective as lacking adequate evidentiary support, as having been issued without appropriate factual findings, and as reversing the usual presumption in favor of disclosure.

Without responding directly to the state's argument that the orders undercut

4. Our conclusion is in no way affected by the district court's stipulation that the incentive awards were to be deducted from the approximately $ 1.659 million already set aside for attorney fees and expenses. Although payment of the awards would have no impact on the amount remaining for the payment of claims from the settlement fund and for resid-

ual programming for the class members, the state is entitled to have "the agreement enforced according to its original terms without the imposition of conditions not bargained for by the parties." *In re Southern Ohio Correctional Facility,* No. 97–4491, 191 F.3d 453, 1999 WL 775830 at 4.

the terms of the settlement agreement, the plaintiffs counter that issuance of the orders was within the court's discretion because allocation of the settlement proceeds was part of an ongoing settlement process of a sort for which there is no tradition of public accessibility. In general, it seems to us, the state has the better of this argument.

It is true that there is no tradition of public access to settlement negotiations and other proceedings directly aimed at achieving settlements. See *In re Cincinnati Enquirer*, 94 F.3d 198, 199 (6th Cir. 1996), where we declined to issue a writ of mandamus that would have permitted public access to the summary jury trial that preceded the settlement in the case at bar. But there is an important distinction, in our view, between negotiating a settlement in the first instance and using court resources to implement a settlement that has already been agreed to. See *Newman v. Graddick*, 696 F.2d 796 (11th Cir.1983), where the presumption in favor of access to judicial records was held applicable to prisoner lists filed during implementation of a consent decree that required state officials to reduce the numbers of prisoners housed in county jails. See also *Bank of America Nat'l Trust v. Rittenhouse*, 800 F.2d 339 (3d Cir.1986) (presumption of access applied to documents filed under seal in connection with motions to enforce settlement agreement in debt collection case).

■ The settlement approved by the district court in the case at bar was funded with taxpayer dollars, and the public has a legitimate interest in knowing how this money is being spent. The court-appointed administrator's adjudication of claims against the settlement fund was subject to review by the district court at the instance of either side, and it seems to us that the function of deciding the merits of the individual claims is sufficiently judicial in character to bring the relevant records within the tradition of accessibility.[5]

This is not to say that the identities of inmates receiving funds should be subject to disclosure. No one has made such a claim, and ¶ 9 of the General Protocol expressly provides that no inmate receiving funds shall be identified by name in any public filing. As the district court properly recognized, the settlement agreement should not be implemented in such a way as to render ¶ 9 a nullity. It would thus be well within the district court's discretion to order that names, cell numbers, and other information that could be used for identifying successful claimants be redacted from the claims documents prior to their release.

We are not persuaded, moreover, that ¶ 9 would preclude the district court from taking similar measures to protect the privacy of persons other than successful claimants (informants or guards, *e.g.*), if it should be shown that identification of such persons would subject them to an appreciable risk of harm. "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).

The orders at issue here, however, bar public access to every claim document in its entirety, regardless of its apparent potential for misuse. The orders were entered without an evidentiary hearing and without "findings specific enough that a

---

5. We note, in this connection, that at the status conference held on December 23, 1999, the district court said that it did not under-stand the materials submitted to the claims administrator to be confidential. The court was correct, we believe.

reviewing court can determine whether the closure order was properly entered." *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 9–10, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). It is important that the reviewing court be given a basis for determining whether the closure order is essential to preservation of the interest articulated by the district court (inmate safety, *e.g.*) and is "narrowly tailored to serve that interest." *Id.* at 9, 106 S.Ct. 2735.

Accordingly, we shall remand this case to the district court for reconsideration of the challenged portions of the protective orders. The plaintiffs should be accorded an opportunity to present competent evidence of the extent to which unsealing of the claim documents would jeopardize the safety of inmates or others. Insofar as the district court may find that some or all of the claim documents contain data as to which the presumption in favor of public access has been overcome, the court should categorize with specificity the data that are to be protected and should enter detailed findings justifying nondisclosure of such data.

## C

We turn now to the denial of Cuyahoga County's motion to intervene as of right.

Rule 24(a), Fed.R.Civ.P., provides as follows:

"Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical

matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Fed. R.Civ.P. 24(a).

 Focusing on (2), we have said that this rule requires consideration of four elements: " '(1) timeliness of the application to intervene, (2) the applicant's substantial legal interest in the case, (3) impairment of the applicant's ability to protect that interest in the absence of intervention, and (4) inadequate representation of that interest by parties already before the court.' " *Stupak–Thrall v. Glickman,* 226 F.3d 467, 471 (6th Cir. 2000), quoting *Michigan State AFL–CIO v. Miller,* 103 F.3d 1240, 1245 (6th Cir. 1997). Any one of these elements may provide a basis for denying intervention. *Stupak–Thrall,* 226 F.3d at 471.

 Here the district court found it necessary to examine only the first and third elements. The first—timeliness of the application to intervene—is normally analyzed in the context of the following factors:

"(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention." *Id.* at 473.

Against this background, the district court found it significant that the county's mo-

tion to intervene had not been filed until settlement had already been reached; that the procedures provided for in O.R.C. § 5120.133 could accomplish the intervenors' objectives without burdening the court;[6] and that intervention would prejudice the original parties because the presence of the county would impose additional burdens upon the administrator. See *In re Southern Ohio Correctional Facility,* No. C–1–93–436 (S.D.Ohio Feb. 28, 2000) (order).

As to the third element—impairment of the applicant's ability to protect its interest in the absence of intervention—the district court found that the county would not be impaired because O.R.C. § 5120.133 affords an alternative process for collecting outstanding debts. See *id.* The district court refuted the county's argument that the identities of successful claimants were to be kept secret by pointing out that the Ohio Attorney General had long since provided all Ohio counties a list of inmates who could be successful in the awards process. See *id.*

█ In our view, the district court did not abuse its discretion in finding Cuyahoga County's application for intervention untimely. The application came almost three years after the fairness hearing that led to approval of the settlement and more than five years after the district court certified the case as a class action. Although determining timeliness is not merely a matter of "counting days," see *United States v. Alcan Aluminum, Inc.,* 25 F.3d 1174, 1181 (3d Cir.1994), this is a case

where the motion to intervene was not filed until after the parties had agreed upon a settlement, had created a complicated administrative scheme through which to carry it out, and either had reached the payment phase or were about to do so. The county, aware that prisoners had outstanding obligations, knew or should have known of its interest years before it moved to intervene. Rather than working with the state in crafting a settlement that would accommodate the county's interest, the county did nothing until the eleventh hour.

Our conclusion that the district court did not abuse its discretion in finding Cuyahoga County's application untimely renders it unnecessary for us to decide whether the other requirements of Rule 24(a) were satisfied.

The order denying intervention (Case No. 00–3454) is AFFIRMED. The order granting incentive awards (Case No. 00–3090) is REVERSED. Case No. 00–3455 is REMANDED for further proceedings not inconsistent with this opinion.

---

**6.** O.R.C. 5120.133 provides a summary collection procedure under which a certified copy of a judgment against an inmate is submitted to the Ohio Department of Rehabilitation and Corrections. Funds may then be deducted directly from the inmate's account without the need for further judicial intervention. The county suggests that this device would be ineffective because the identities of successful claimants are secret and because some successful claimants are likely to have been released prior to receipt of the judgments against them.