RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0295P (6th Cir.)
File Name: 00a0295p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

KATHY STUPAK-THRALL,
et al.,

      *Plaintiffs-Appellees,*

      *v.*

DANIEL GLICKMAN, et al.,

      *Defendants,*

THE WILDERNESS SOCIETY,
et al.,

      *Proposed Intervenors-
Appellants.*

No. 99-1353

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 98-00113—Robert Holmes Bell, District Judge.

Argued: December 10, 1999

Decided and Filed: September 1, 2000

Before:  BATCHELDER and MOORE, Circuit Judges;
O'MALLEY, District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  William L. Underwood, FAEGRE & BENSON, Minneapolis, Minnesota, for Appellants. William P. Pendley, MOUNTAIN STATES LEGAL FOUNDATION, Denver, Colorado, for Appellees.  **ON BRIEF:**    William L. Underwood, Elizabeth H. Schmiesing, FAEGRE & BENSON, Minneapolis, Minnesota, for Appellants.  William P. Pendley, Adam T. Reeves, MOUNTAIN STATES LEGAL FOUNDATION, Denver, Colorado, for Appellees.

O'MALLEY, D. J., delivered the opinion of the court, in which BATCHELDER, J., joined.  MOORE, J. (pp. 25-30), delivered a separate dissenting opinion.

_____

**OPINION**

_____

O'MALLEY, District Judge.  This case raises the purely procedural issue of whether the district court properly denied a motion to intervene.  For the reasons stated below, we **AFFIRM**.

**I.  Litigation History.**

This case comes to us with a great deal of history, which we summarize here.  Crooked Lake is located in the upper peninsula of Michigan, near the Wisconsin border.  Since about 1966, 95% of the land surrounding Crooked Lake has been owned by the federal government, while 5% remains

_____

[*]The Honorable Kathleen McDonald O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

Nevertheless, the Wilderness Association argues that its interests would not be adequately represented in any settlement negotiations that may take place between the parties. Unlike the majority, I believe that the Wilderness Association's concerns are valid. The litigation between these parties has spanned five years, and there are currently two other appeals related to the instant case pending in this court. The federal defendants have appealed the decision in *Stupak-Thrall II*, in which the district court held invalid certain motor boating restrictions. That appeal has been stayed pending resolution of the plaintiff's appeal of the district court's grant of summary judgment to the federal defendants in this case, which itself has been stayed pending the outcome of this appeal. The possibility is real that the federal defendants may be willing to enter into settlement negotiations in order to resolve these issues; and if the parties do begin settlement negotiations, this would present the very conflict in interest between the federal defendants and the Wilderness Association regarding wilderness management issues that was outlined above. *Cf. Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 1001 (8th Cir. 1993) ("Although the Band notes that the counties' and the landowners' proposed answers are almost identical to the answer filed by the state, there is no assurance that the state will continue to support all the positions taken in its initial pleading. Moreover, if the case is disposed of by settlement rather than by litigation, what the state perceives as being in its interest may diverge substantially from the counties' and the landowners' interests.").

I therefore believe that the Wilderness Association has sufficiently demonstrated that representation of its interests may be inadequate. Accordingly, I would reverse the district court's denial of the Wilderness Association's motion to intervene.

privately held; there are only a handful of private parcels of land. The private landowners include: (1) the Gajewskis, plaintiffs who run a motorboat fishing camp and resort on the lake; (2) plaintiff Kathy Stupak-Thrall, who owns and rents out lakefront cabins belonging to her family since 1939; and (3) proposed intervenor Thomas Church, who has owned a lakefront cabin since 1990. The privately held land is all on a small bay on the north side of the lake. Under Michigan law, the private landowners, together with the federal government, hold in common certain riparian rights in the entirety of Crooked Lake.[1]

When the government purchased the Crooked Lake land in 1966, it made the land part of the Ottawa National Forest, which is administered by the United States Forest Service. Subsequently, in 1987, Congress passed the Michigan Wilderness Act. This Act, among other things, created the "Sylvania Wilderness Area;" all of Crooked Lake, except for the small northern bay portion where the private landowners are located, was included within this Sylvania Wilderness Area. Then, in 1992, the Forest Service passed a regulation (known as "Amendment One") prohibiting, among other things: (1) use of houseboats or sailboats on any part of Crooked Lake lying within the Sylvania Wilderness Area; and (2) use of nonburnable disposable food containers (e.g., beer bottles) within the Wilderness Area.

Stupak-Thrall and the Gajewskis responded by filing suit, claiming that Amendment One had the effect of interfering with their state-law riparian rights. This case is known as "*Stupak-Thrall I*." The plaintiffs ultimately lost, in a very close battle. *Stupak-Thrall v. United States*, 843 F. Supp. 327 (W.D. Mich. 1994), *affirmed*, 70 F.3d 881 (6th Cir. 1995), *rehearing en banc granted and opinion vacated*, 81 F.3d 651 (6th Cir. 1996), *affirmed en banc by an equally divided court*,

---

[1]They actually hold "littoral" rights (referring to a lake), not "riparian" rights (referring to a river), but Michigan case law refers to both lake- and river-connected rights as riparian. *Thies v. Howland*, 380 N.W.2d 463, 466 n.2 (Mich. 1985).

89 F.3d 1269 (6th Cir. 1996), *cert. denied*, 519 U.S. 1090 (1997). The validity of Amendment One is not at issue in this case.

In 1995, the Forest Service passed another regulation (known as "Amendment Five"), this time prohibiting use of non-electric motorboats in the Sylvania Wilderness Area. Stupak-Thrall and the Gajewskis again filed suit; this time, they won in district court. *Stupak-Thrall v. Glickman*, 988 F. Supp. 1055 (W.D. Mich. 1997). This case is known as "*Stupak-Thrall II*." A separate appeal is currently pending in *Stupak-Thrall II*, but this Court is holding the appeal in abeyance, so that: (1) we may first issue a ruling in this appeal, and (2) the assigned panel may first issue a ruling in the related appeal from the final judgment in *Stupak-Thrall III*, which is described below. The validity of Amendment Five is also not at issue in this case.

Most recently, in 1998, Stupak-Thrall and the owners of five other pieces of Crooked Lake private land[2] filed this lawsuit to challenge the Forest Service's underlying jurisdiction to regulate the Sylvania Wilderness Area; this represented a different tactic than the plaintiffs used in their previous lawsuits, where they challenged the Forest Service's individual regulations. Specifically, in this action, the landowner-plaintiffs argue that: (1) when Congress passed the Michigan Wilderness Act, it required the Forest Service to create an "official map and legal description" of the Sylvania Wilderness Area; (2) the Forest Service never did so; (3) thus, Crooked Lake was not within any "official boundary" of the Sylvania Wilderness Area; and (4) the Forest Service therefore had no authority to pass *any* regulations governing Crooked Lake. The landowner-plaintiffs named as defendants various federal agencies and employees, referred to collectively below as the "Federal Defendants." This case is known as "*Stupak-Thrall III*."

---

[2]There are actually 13 individual plaintiffs in this case, most of whom are husbands and wives; all told, they own 6 pieces of private land.

question is whether the interests of the Wilderness Association are adequately represented by the federal defendants.

With regard to this final element, ordinarily a proposed intervenor need only show that representation of its interests "'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). "It has been said that, given this standard, the applicant should be treated as the best judge of whether the existing parties adequately represent his or her interests, and that any doubt regarding adequacy of representation should be resolved in favor of the proposed intervenors." 6 MOORE'S FEDERAL PRACTICE § 24.03[4][a], at 24-42 (3d ed.) (footnote omitted). The district court, relying on the *parens patriae* doctrine, held that the Wilderness Association had failed to make "a strong affirmative showing" that the federal defendants were inadequate representatives of its interests. J.A. at 43 (D. Ct. Op.) (internal quotation marks omitted). The majority correctly notes that the district court's reliance on the *parens patriae* doctrine was erroneous, as we have previously rejected this doctrine. *See Grutter*, 188 F.3d at 400.

It is clear that with regard to wilderness management issues, the interests of the federal defendants and the Wilderness Association are likely to diverge; while both parties' broad goal is to preserve the wilderness character of the Sylvania Wilderness, the Wilderness Association has often advocated for greater management restrictions than the federal defendants think appropriate. The instant litigation, however, is not a challenge to particular management restrictions, but is rather a challenge to the federal defendants' authority to include Crooked Lake within the boundaries of the Sylvania Wilderness. On this issue the interests of the Wilderness Association and the federal defendants are largely coextensive; both maintain that the boundaries of the Sylvania Wilderness as originally designated are proper.

summary judgment motion." *Id.* at 341. Because the Wilderness Association submitted a brief in support of summary judgment just one day after the court-ordered deadline for the filing of dispositive motions, it is difficult to understand how permitting the Wilderness Association to submit its brief as a party defendant rather than as an amicus curiae would have made any difference to the course of the proceedings. As in *Jansen*, in the instant case the original parties would not have been prejudiced by the timing of the motion to intervene. The majority disagrees, explaining that "if the district court had allowed the appellants to become *parties*, appellants would certainly have sought to obtain discovery, submit expert reports, and so on." *Ante*, at 21. This is speculation. The Wilderness Association has steadfastly maintained, and it reiterated at oral argument, that it never intended to reopen discovery in the case; instead it sought to intervene in order to participate as a party on appeal and in any settlement negotiations that might occur. Although permitting intervention would have added additional parties and attorneys to the case, there is simply no basis for the conclusion that intervention would have delayed the proceedings or prejudiced the appellees.

In sum, a consideration of the five timeliness factors leads me to the conclusion that the Wilderness Association's motion was timely for purposes of intervention of right.

Furthermore, I believe that the Wilderness Association has satisfied each of the three additional elements required for intervention of right pursuant to Rule 24(a): a substantial legal interest in the case; impairment of the ability to protect that interest in the absence of intervention; and inadequate representation of that interest by the parties before the court. *See Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999). It is beyond doubt that the Wilderness Association's interests in preserving and protecting the Sylvania Wilderness and its participation in the process leading to the designation of the Sylvania Wilderness are sufficient to support intervention of right, and that these interests will be impaired if the appellees prevail in the instant action. The significant

On cross-motions for summary judgment, the district court below granted summary judgment to the Federal Defendants in *Stupak-Thrall III*. A separate appeal of this grant of summary judgment is currently pending. Again, however, this Court is holding that appeal in abeyance, so that we may first issue a ruling in the instant case. Thus, the validity of the Forest Service's authority to administer the Sylvania Wilderness Area is also not at issue in this specific appeal.

So what does this appeal concern? In *Stupak-Thrall III*, before the district court granted summary judgment to the Federal Defendants, four parties – who refer to themselves collectively as "the Wilderness Association" – jointly sought to intervene as parties-defendant. The district court denied their motion. It is this denial of the motion for intervention, alone, that is the subject of the instant appeal. In sum, there are two separate appeals pending in *Stupak-Thrall III*, and ours has *only* to do with the propriety of the denial of the motion to intervene. We have jurisdiction over the proposed intervenors-appellants' timely appeal, pursuant to 28 U.S.C. §1291.

## II.  The Proposed Intervenors.

The "Wilderness Association" is comprised of the following proposed intervenors-appellants: (1) the Wilderness Society; (2) the Wilderness Watch; (3) the Upper Peninsula Environmental Coalition ("UPEC"); and (4) Thomas Church. Church is one of the private landowners on Crooked Lake. His views regarding the appropriate level of human presence on the lake are in strong opposition to those of Stupak-Thrall and the other plaintiffs-appellees – he believes the Forest Service's regulations, including Amendments One and Five, do not go far enough. Indeed, Church has argued to the Forest Service, apparently without success (so far), that it should: (1) also prohibit dogs, ATVs, and snowmobiles from the Sylvania Wilderness area and Crooked Lake; (2) strictly limit the number of people allowed into the Sylvania Wilderness Area; and (3) close certain access roads. Further, while Church agrees with the Forest Service that gasoline-

powered motorboats should be banned from Crooked Lake completely, the record suggests he believes electric motorboats also should be banned. Thus, to at least some extent, Church and the Federal Defendants have different views regarding regulation of the Sylvania Wilderness Area.

The other appellants are environmental groups which, to generalize, tend to agree with Church – they think the Forest Service often does not go far enough in protecting the "unblemished wildness" of *all* federal Wilderness Areas, either because its regulations are too weak or are not enforced. Like Church, these other appellants clearly have views not entirely coterminous with those of the Federal Defendants regarding the specific details of the Forest Service's regulations governing the Sylvania Wilderness Area.[3] The Federal Defendants and the appellants agree fully, however, that the plaintiffs' ultimate goal in this case – to nullify the status of Crooked Lake as part of the Sylvania Wilderness – should not prevail.

---

[3]For example, Wilderness Watch successfully sued the Forest Service to eliminate use of motorized means of transporting boats across portages in the Boundary Waters Canoe Area Wilderness in Minnesota. *Friends of the Boundary Waters Wilderness v. Robertson*, 978 F.2d 1484 (8th Cir. 1992), *cert. denied*, 508 U.S. 972 (1993). As another example, the Wilderness Society, of which Church is a member, submitted detailed comments to the Forest Service's proposed regulations and draft management plan regarding the Sylvania Wilderness Area. The Federal Defendants, however, did not oppose the appellants' motion to intervene.

primarily for the purposes of ensuring that its interests would be represented in the event of an out-of-court settlement, as well as ensuring that its interests would be protected in any additional litigation, including appellate proceedings.[1] Considering all the circumstances and the purposes for which the Wilderness Association sought to intervene, I believe that the Wilderness Association did not unduly delay in filing its motion to intervene.

Most importantly, permitting the Wilderness Association to intervene at that time would not have caused any prejudice to the original parties. The Wilderness Association filed a proposed answer to the plaintiffs' complaint along with its motion to intervene before the federal defendants had even made a filing, and it filed an amicus curiae brief in support of the federal defendants' motion for summary judgment just one day after the defendants filed their motion. The instant situation is similar to the one presented in *Jansen v. City of Cincinnati*, 904 F.2d 336 (6th Cir. 1990), in which we held a motion to intervene timely based in part on the fact that "less than two weeks after moving to intervene[] the proposed intervenors moved to file a memorandum in opposition to summary judgment and tendered the memorandum with the motion," which enabled the district court "to consider proposed intervenors' interest without delaying a ruling on the

---

[1]The majority explains that the purposes for which the Wilderness Association sought to intervene "provide, at most, only lukewarm support for their motion." *Ante*, at 19. The majority rests this conclusion on the fact that the views of the Wilderness Association are largely in accord with those of the federal defendants on the central substantive question presented in the case. The majority rejects, as too speculative, the Wilderness Association's argument that its interests would not adequately be protected in the event of a settlement or in the event that the federal defendants were to abandon the litigation. I believe that the majority's discussion of adequacy of representation is inappropriate in the timeliness analysis; the point of looking to the purposes of intervention as a factor in the timeliness analysis is to determine whether the proposed intervenors acted promptly in light of the purposes for which intervention was sought. In any event, as I will explain below, I do not believe that the interests of the Wilderness Association are adequately represented by the federal defendants.

addressed this element in their briefs, they did not do so on the assumption that the district court found the motion to intervene untimely. In fact, the Wilderness Association argued that the district court impliedly found its motion to intervene timely. Second, I fail to see how the parties' discussion of this element (in addition to the three other elements) provides any evidence of what the district court implicitly held.

In the absence of specific district court findings regarding timeliness, this court has previously assumed that the proposed intervenors satisfied the timeliness requirement. *See Bradley v. Milliken*, 828 F.2d 1186, 1191-92 (6th Cir. 1987) ("The district court did not rely on untimeliness to deny the proposed intervenors' motion, and we believe it would be improper to make findings on all the relevant criteria without the benefit of the district court's insights. Therefore, for the remainder of our analysis, we will assume that the threshold requirement of timeliness has been met."). Such an approach would have been appropriate in this case. At the very least, the majority should have reviewed this element de novo, rather than for abuse of discretion.

Moving to the merits, I disagree with the majority's analysis of the five timeliness factors. First, although the Wilderness Association's motion to intervene was not filed until nearly seven months after the filing of the complaint, and although the Wilderness Association arguably should have known that its interests were implicated from the outset, I do not believe that "it was very late in the course of the litigation, by every measure." *Ante*, at 13. The motion to intervene was filed on December 11, 1998. While the discovery period was already closed at that time, no dispositive motions had yet been filed, and in fact that deadline was still nearly two months away. The suit, therefore, had not progressed far in terms of filings or rulings. Furthermore, the Wilderness Association did not seek intervention for the purpose of reopening discovery, which would undoubtedly have caused delay in the proceedings. Instead, the Wilderness Association sought to intervene

## III.  The Legal Standard for Intervention.

With their motion, the appellants sought to intervene both as of right and permissively, invoking Fed. R. Civ. P. 24(a & b).[4] Regarding intervention of right, we have interpreted Rule 24(a) as establishing four elements, each of which must be satisfied before intervention as of right will be granted: "(1) timeliness of the application to intervene, (2) the applicant's substantial legal interest in the case, (3) impairment of the applicant's ability to protect that interest in the absence of intervention, and (4) inadequate representation of that interest by parties already before the court." *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997); *see Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999) (same). "Failure to meet [any] one of the [four] criteria will

---

[4] These rules state:
**(a)  Intervention of Right**.  Upon timely application anyone shall be permitted to intervene in an action:
(1)  when a statute of the United States confers an unconditional right to intervene; or
(2)  when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
**(b)  Permissive Intervention.**  Upon timely application anyone may be permitted to intervene in an action:
(1)  when a statute of the United States confers a conditional right to intervene; or
(2)  when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.
Fed. R. Civ. P. 24.

require that the motion to intervene be denied." *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir.1989). We review a district court's decision regarding timeliness (the first element) for abuse of discretion; the remaining three elements are reviewed de novo. *Grutter*, 188 F.3d at 398.

Regarding permissive intervention, "so long as the motion for intervention is timely and there is at least one common question of law or fact, the balancing of undue delay, prejudice to the original parties, and any other relevant factors is reviewed for an abuse of discretion." *Miller*, 103 F.3d at 1240. Given that our review of permissive intervention is for abuse of discretion, while our review of intervention as of right (except as to the timeliness element) is de novo, we may conclude that a denial of intervention as of right was error, but a denial of permissive intervention was not. *Grutter*, 188 F.3d at 401.

Rule 24 should be "broadly construed in favor of potential intervenors." *Purnell v. Akron*, 925 F.2d 941, 950 (6th Cir. 1991). Indeed, in discussing the fourth element of intervention as of right, we have recently gone so far as to say that "proposed intervenors need only show that there is a *potential* for inadequate representation." *Grutter*, 188 F.3d at 400 (emphasis in original). But this does not mean that Rule 24 poses no barrier to intervention at all. We have affirmed the denial of motions to intervene permissively and as of right, for various reasons. *E.g.*, *Jordan v. Michigan Conf. of Teamsters Welfare Fund*, 207 F.3d 854, 863 (6th Cir. 2000) (affirming denial of a motion to intervene as of right, because the motion was untimely and the proposed intervenor's interests were adequately represented); *Bradley v. Milliken*, 828 F.2d 1186, 1194 (6th Cir. 1987) (affirming denial of motions to intervene permissively and as of right, in part because "the district court has already taken steps to protect the proposed intervenors' interests by inviting [their counsel] to appear as amicus curiae in the case").

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. The majority affirms the district court's denial of the appellants' ("Wilderness Association's") motion to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a) on the ground that the motion was untimely. Because I believe that, considering all relevant circumstances, the Wilderness Association's motion was timely, and because the Wilderness Association has satisfied the three other requirements for intervention of right, I respectfully dissent from the majority's opinion.

I must first register my disagreement with the majority's decision to affirm the district court on timeliness grounds. As both the majority and the plaintiffs-appellees recognize, the district court made no explicit conclusion with regard to the timeliness of the Wilderness Association's motion to intervene. *See ante*, at 9; Br. of Appellees at 4 ("The district court made no specific findings as to the timeliness of the Wilderness Association's Motion to Intervene."). Nevertheless, the majority explains that the opinion reflects an "implicit[] conclu[sion]" that the motion was not timely filed, and it reasons that the district court denied the motion at least in part based on timeliness grounds. *Ante*, at 9. Unlike the majority, I find no such implicit conclusion in the district court's opinion; to the contrary, I believe that the district court could not have been more clear that its decision rested entirely on adequacy of representation. In summarizing its analysis, the district court wrote: "The Wilderness Association has not met its burden of showing that the government defendants will not adequately protect their interests. Accordingly, it is not entitled to intervention as of right under Rule 24(a)(2)." J.A. at 43 (D. Ct. Op.). The majority's reliance on the fact that the parties discussed timeliness in their appellate briefs as support for its conclusion that the district court made a finding of untimeliness is unfounded. First, although the parties

to intervene.  Accordingly, the district court's order denying intervention is **AFFIRMED**.

## IV.  The "Timeliness" Element.

Given the basis for our ruling, it bears repeating that: (1) "[w]hether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely,'" *NAACP v. New York*, 413 U.S. 345, 365 (1973); and (2) we review the district court's conclusion about the timeliness element, under both types of intervention, for abuse of discretion, *Velsicol Chemical Corp. v. Enenco, Inc.*, 9 F.3d 524, 531 (6th Cir. 1993).

In denying the appellants' motion to intervene, the district court examined only the first and fourth elements of Rule 24(a).   Regarding the first element – timeliness of the application to intervene – the district court observed: "This action was filed on May 13, 1998.  The motion to intervene was not filed until December 11, 1998."   Without saying more, the district court implicitly concluded that the appellants' motion to intervene was not timely filed.  The parties have argued at length, on appeal, whether this conclusion was an abuse of the district court's discretion.[5] We conclude it was not.

---

[5]The district court focused in depth on the fourth element, addressing the first element less closely.  That the parties focused their appellate arguments on the timeliness element gives support to the conclusion that the district court did, in fact, deny the motion for intervention based, in part, on the first element (timeliness), and not exclusively on the fourth element (adequacy of representation).  Indeed, the parties did *not* argue on appeal that we should remand this case to the district court for an explicit recitation of whether and why the motion to intervene was untimely – that is, for a fuller explanation of how the district court exercised its discretion – apparently believing the district court's two-sentence explanation of untimeliness is sufficient.  The appellants' only remand argument was that the district court did not provide a rationale for its decision to deny permissive intervention.  Appellants' brief at 11, 34-35.  In any event, even if we were to conclude that the district court made *no* finding regarding timeliness, remand would still be inappropriate; rather, our level of review would then change from abuse of discretion to de novo.  *Sierra Club v. Espy*, 18 F.3d 1202, 1205 n.2 (5th Cir. 1994).

The determination of whether a motion to intervene is timely "should be evaluated in the context of all relevant circumstances." *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990). We have held that the following factors should be considered in determining timeliness:

(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Id.*

Critical to our analysis is the timing of certain events during litigation of *Stupak-Thrall III* before the district court. The case docket reveals the following procedural history:

May 13, 1998:    the plaintiffs file their complaint.

June 3, 1998:    the plaintiffs file a motion for preliminary injunction.

June 10, 1998:    the district court enters an "Order to Answer," directing the defendants to file a response to the motion for preliminary injunction.

June 23, 1998:    the parties file a stipulation temporarily mooting the motion for preliminary injunction.

July 10, 1998:    the parties file a joint motion to stay proceedings, to facilitate settlement negotiations.

On appeal, the appellants argue strongly that we should not adopt the *parens patriae* doctrine, and the plaintiffs argue equally strongly that we should. Recently, we announced that this doctrine generally has no hold in this Circuit. *See Grutter*, 188 F.3d at 397-98 (rejecting the general proposition that "a stronger showing of inadequacy is required when a governmental agency is involved as the existing defendant," and noting that "this circuit has declined to endorse a higher standard for inadequacy when a governmental entity is involved"). Because we issued our opinion in *Grutter* after the district court entered final judgment below, the district court did not have the benefit of our reasoning. Nonetheless, we confirm the appellants' position on this point: the district court's analysis was incorrect to the extent it assessed the adequacy of representation of the proposed intervenors' interests, by parties already before the court, under the *parens patriae* doctrine.[15]

## VI. Conclusion.

For the reasons stated above, we conclude the district court properly denied the proposed intervenors-appellants' motion

---

[15]We note that this fourth element of the analysis of intervention as of right – adequacy of representation – overlaps to some degree with the "purposes of intervention" prong of the first element – timeliness. These aspects of the intervention analysis, however, have a different focus. The "purposes of intervention" prong of the timeliness element normally examines *only* whether the lack of an earlier motion to intervene should be excused, given the proposed intervenor's purpose – for example, when the proposed intervenor seeks to intervene late in the litigation to ensure an appeal. *See Triax Co. v. TRW, Inc.*, 724 F.2d 1224, 1228 (6th Cir. 1984) (proposed intervenor's post-judgment motion to intervene as of right held timely, because his purpose was to prosecute an appeal that would not otherwise have been filed); *see also United Airlines, Inc. v. McDonald*, 432 U.S. 385, 392 (1977) (proposed intervenor's post-judgment motion to intervene held timely, because her purpose was to appeal the denial of class certification, not to litigate her individual claim). The adequacy of representation element is more broad. We do not reach the adequacy of representation issue in this case, finding it unnecessary to do so in light of our conclusion on the timeliness issue.

### F. Summary.

By virtue of the Federal Rules of Civil Procedure, Congress has instructed courts to examine the question of timeliness when gauging the propriety of a motion to intervene, whether permissively or as of right. The Supreme Court has explained that "[t]imeliness is to be determined from all the circumstances. And it is to be determined by the [district court] in the exercise of its sound discretion; unless that discretion is abused, the [district court's] ruling will not be disturbed on review." *NAACP v. New York*, 413 U.S. at 366 (footnotes omitted).

In this case, the five factors we must weigh to assess timeliness are either neutral, or preponderate against intervention. Given the totality of the circumstances in this case, we cannot conclude that the district court abused its discretion in denying the appellants' motion to intervene.

### V. Adequacy of Representation.

Given that timeliness is a requirement equally for intervention permissively or as of right, *Velsicol Chemical Corp.*, 9 F.3d at 531, our analysis comes to an end. We feel compelled to add, however, a brief note regarding an issue over which the parties strongly disagreed on appeal.

The district court, in its opinion denying intervention, concluded that the appellants did not show the fourth element of intervention as of right – inadequate representation of the proposed intervenor's interests by parties already before the court. In its analysis, the district court relied on the *parens patriae* doctrine. This doctrine holds that "when one of the parties is an arm or agency of the government, and the case concerns a matter of 'sovereign interest,' the [intervention] bar is raised, because in such cases the government is 'presumed to represent the interests of all its citizens.'" *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996) (quoting *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 989 F.2d 994, 1000 (8th Cir. 1993)).

July 13, 1998:    the parties file a second stipulation temporarily mooting the motion for preliminary injunction.

July 15, 1998:    the district court denies the joint motion to stay proceedings.

July 17, 1998:    the plaintiffs file an amended complaint, with leave of court.

July 31, 1998:    the district court enters its case management order, *assigns the case to an expedited track*, and sets the following deadlines:
• Aug. 17, 1998 – joinder of parties and amendment of pleadings.
• Oct. 1, 1998 – discovery completed.
• Oct. 5, 1998 – plaintiffs' identification of all witnesses, including experts.
• Nov. 5, 1998 – defendants' identification of all witnesses, including experts.
• Feb. 1, 1999 – dispositive motions due.
• Mar. 29, 1999 – oral argument on dispositive motions.

Dec. 11, 1998:    the appellants file their motion to intervene.

Jan. 29, 1999:    the district court denies the motion to intervene, but allows appellants to file an amicus curiae brief.

Jan. 29, 1999:    pursuant to the parties' request, the district court clarifies the dispositive motion briefing deadline, ordering the defendants to file their motion on Feb. 1, 1999 and the

plaintiffs to file their cross-motion/response on Feb. 22, 1999.[6]

Feb. 1, 1999:    the defendants timely file their motion for summary judgment.

Feb. 2, 1999:    the appellants file an amicus curiae brief.

Feb. 17, 1999:    the plaintiffs move for an extension of time to file their cross-motion for summary judgment.

March 4, 1999:    the district court denies the plaintiffs' motion for extension of time and orders the plaintiffs to file their cross-motion by March 9, 1999.

March 12, 1999:    the plaintiffs file their cross-motion for summary judgment (3 days late).

April 2, 1999:    the district court enters its order granting summary judgment to the defendants.

There are a number of notable things about this chain of events. First, the Federal Defendants never filed an answer to the plaintiffs' original or amended complaints. Apparently, the Federal Defendants overlooked this requirement, having: (1) been ordered by the district court, on June 10, 1998, to "answer" by filing a response to the motion for preliminary injunction; and (2) reached a stipulation that mooted the plaintiffs' motion for preliminary injunctive relief, pending the district court's ruling on the summary judgment motion.

Second, the district court set an expedited case management plan, and stuck to it. When the district court entered its case

---

[6] This was not an extension of the existing deadline; it was a ruling that the plaintiffs should combine their cross-motion for summary judgment with their response brief, rather than file their cross-motion simultaneously with the defendants' motion.

briefs on the issues, then their participation as amici curiae should have been sufficient.

Indeed, if the district court had allowed intervention only on the condition that the existing case-specific deadlines remained intact – thereby protecting the original parties from delay and undue prejudice, and conforming with Congress's mandate to adopt and adhere to a delay reduction plan – the appellants surely would be complaining now that the district court should have allowed them to conduct some discovery and submit their own expert reports. It is more likely that allowing intervention would have substantially interfered with the orderly processes of the district court.

The appellants also insist that allowing them to intervene would not cause the plaintiffs any prejudice, "undue" or otherwise. But this bald statement disregards the economic realities of this case. Each day that the Federal Defendants' regulations governing Crooked Lake are upheld translates as another day of lost income to the plaintiffs. *See Stupak-Thrall II*, 988 F. Supp. at 1059 ("[p]otential renters have told Stupak-Thrall that they will not rent [her Crooked Lake properties] if they cannot use gas powered motor boats;" and "[a]fter news was received about the passage of Amendment No. 5 and the ban on gas motors, Mr. Gajewski noticed an immediate decline in reservations [at his Crooked Lake Resort]," so that "he fears his business will not survive"). Allowing intervention would, indeed, cause delay and undue prejudice to the plaintiffs. This factor weighs against intervention.

### E. Unusual Circumstances Militating Against or in Favor of Intervention.

The only unusual circumstance identified by the appellants is the death of Mr. Kuhlmann, which we discussed above. This factor does not weigh in favor of the appellants.

appellants were or should have been aware of *Stupak-Thrall III* shortly after it was filed. Ultimately, the appellants present no persuasive excuse for having waited seven months before moving to intervene.[14]

### D.  Prejudice to the Original Parties.

In their brief in opposition to intervention filed with the district court, the plaintiffs-appellees wrote:

> Adding additional parties to this action will delay the proceedings by making the action more complex. Plaintiffs have served their expert reports. Dispositive motions are due to be completed soon. A trial date has been set. It strains credulity to assert that adding four additional parties and five attorneys to a case so far along will not delay and prejudice Plaintiffs.

J.A. at 97.  The appellants, essentially conceding that intervention without delay and resulting prejudice would have been incredible, did not even *attempt* to assert a counter-argument before the district court.

On appeal, the appellants do argue that allowing intervention would not carry with it any prejudice or undue delay. But appellants' arguments are unpersuasive. The appellants first insist that intervention would not have caused any delay, as shown by their having timely filed an amicus brief before the district court. This argument, of course, ignores the fact that, if the district court had allowed the appellants to become *parties*, appellants would certainly have sought to obtain discovery, submit expert reports, and so on; if the appellants sought to intervene only in order to submit

---

[14]We do not mean to downplay the loss the Wilderness Association surely suffered due to Mr. Kuhlmann's tragic and untimely passing. The quality of his legal work and the depth of his commitment, as revealed by the briefs he has submitted to this Court, reveal that his associates have big shoes to fill.

management order, it informed the parties they had only two months to complete discovery and six months before dispositive motions were due. The district court then adhered to these deadlines, even denying the sole motion for extension of time. The district court gave the parties a relatively lengthy four-month period between the end of fact discovery and the dispositive motion deadline because the expert reports and legal issues were expected to be complex.

Third, although the appellants were not allowed to become parties, they were still able to make known to the district court their concerns, via filing of a brief as amici curiae. In their motion, the appellants asked the district court for permission to intervene *or*, in the alternative, to participate as amici curiae. Joint Appendix ("J.A.") at 48. The district court denied the motion to intervene, but granted the appellants their requested alternative.[7]

Within this context, we now examine the five factors that must guide the district court's discretion in assessing the timeliness of the appellants' motion to intervene.

### A.  The Point to Which the Suit Had Progressed.

It cannot be gainsaid that, when the appellants moved to intervene on December 11, 1998, it was very late in the course of the litigation, by every measure. The case, which was ultimately disposed of 10½ months after it was filed, was already over seven months old; the discovery period had been closed for over ten weeks; all witnesses, including expert witnesses, had been identified over five weeks earlier; the plaintiffs had already produced an expert report and survey;

---

[7]Proposed intervenor-appellant UPEC had earlier filed an amicus brief in *Stupak-Thrall II*. 988 F. Supp. at 1059. Wilderness Watch states it also "will participate" as amicus curiae in *Stupak-Thrall II* on appeal. J.A. at 53. The Honorable Robert Holmes Bell served as the district court judge in both *Stupak-Thrall II* and *Stupak-Thrall III*, so he knew that the proposed intervenors in this action were already very familiar with the subject matter.

and the dispositive motion deadline, originally set 17 weeks after the close of discovery, was only seven weeks away. Having adhered to the expedited track it originally set, the district court, admirably, entered final judgment less than one year after the case was filed.[8]

Appellants argue that, when they filed their motion to intervene, the Federal Defendants had not yet even filed an answer to the complaint; therefore, the litigation was still immature. This argument is specious. As the appellants surely know, the Federal Defendants *never* filed an answer; using the appellants' logic, they could file a motion to intervene with the district court today, over a year after the case was resolved on the merits, and it would still be "timely." Appellants also point to other cases where intervention was allowed after even longer periods of time had passed between the filing of the complaint and the motion to intervene. The propriety of intervention in any given case, however, must be measured under "all the circumstances" of that *particular* case. *NAACP v. New York*, 413 U.S. at 366. The absolute measure of time between the filing of the complaint and the motion to intervene is one of the least important of these circumstances. *See Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (noting, in the context of measuring the timeliness of a motion to intervene, that

---

[8] In an effort to get federal district courts to resolve cases more quickly, Congress enacted the Civil Justice Reform Act of 1990, 28 U.S.C. §§471 *et seq.* This Act required district courts to adopt a "Civil Justice Expense and Delay Reduction Plan." Under the Plan promulgated by the district court of the Western District of Michigan, the district court must assign each case to a "track," and then make strong efforts to adhere to that track's deadlines. Judge Holmes did precisely that. He assigned this case to an "expedited" track, which meant that the case would "be disposed of nine to twelve months from the date the complaint is filed," and discovery would "be completed within 120 days from the date of the [case management conference]." 2 Federal Local Court Rules, *Local Rules of Prac. & Proc. of the U.S. Dist. Ct. for the Western Dist. of Mich.* 72 (2nd ed. 1997) ("Differentiated Case Mgt. Plan Amended Order," dated Sept. 1, 1992). It is certainly fair, therefore, that we measure the appellants' timeliness against deadlines which Congress, itself, asked the district court to set.

---

Service, cannot legitimately believe the Federal Defendants might abandon the litigation. In such circumstances, the right to participate as amici curiae is both meaningful and adequate. In sum, the purposes for which appellants seek intervention provide, at most, only lukewarm support for their motion.

### C. The Duration that the Appellants Knew of Their Interest in the Case.

The third factor is the length of time preceding the appellants' motion to intervene, during which they knew, or should have known, of their interest in the case. That duration is essentially the entirety of the seven months between the filing of the complaint and the motion to intervene. By virtue of *Stupak-Thrall I* and *Stupak-Thrall II*, the appellants have been involved intimately in litigation against the plaintiffs in this case, beginning well before this lawsuit was ever filed.

Appellants concede that they should have known (and probably did know) about their interest in this case, and should have moved to intervene much earlier, but they assert that because appellant UPEC's counsel, Mr. Kuhlmann, suddenly died on September 28, 1998, they were left "confused" about what was happening with all of the Sylvania Wilderness Area litigation. Even assuming that Mr. Kuhlmann was lead counsel for *all* of the appellants, this excuse does not withstand analysis: (1) before this case was ever filed in district court, another member of Mr. Kuhlmann's firm, Mr. Kim, appeared as co-counsel for UPEC as amicus curiae in *Stupak-Thrall II* on appeal, and Mr. Kim knew or should have known about *Stupak-Thrall III*; (2) the same situation applies to the other appellants, who appeared as amici curiae in *Stupak-Thrall II* on appeal with their own individual counsel (Ms. Schmiesing); and (3) even ignoring the existence of co-counsel, appellants' excuse still does not explain their five months of inaction during the time between the May, 13, 1998 filing of the complaint and Mr. Kuhlmann's death. Simply, there can be little doubt that the

The appellants' second stated purpose is unrealistic because the likelihood that the parties will settle is exceedingly small. As demonstrated amply by the litigation history recited above, the plaintiffs are sparing no resources to challenge federal regulation of Crooked Lake,[13] and the Federal Defendants have refused to negotiate. The parties, moreover, have held steadfast with their positions in cases where the central question was merely one of degree; there appears no potential for the parties to settle their differences in this case, where the central question – the Federal Defendants' authority to regulate Crooked Lake *vel non* – is of an "all or nothing" nature. Thus, appellants' stated purpose of protecting their concerns in case of settlement out of court is premised on a fear of a highly unlikely, hypothetical occurrence.

Finally, regarding the appellants' third stated purpose, the strength of the appellants' need to participate as parties in this litigation (instead of "only" as amici curiae) is necessarily commensurate with their first two stated purposes. Appellants want to be parties so that they can file motions and appeals, rather than merely amicus briefs – that is, appellants want some say in deciding litigation tactics. Appellants assert that, without these procedural protections, they can neither assure that the litigation will be pursued by the Federal Defendants nor that their positions will be made known to the concerned judicial tribunals. As noted, however, the circumstances of this case are such that the proposed intervenors cannot meaningfully differentiate their concerns from those of the Federal Defendants and, given the fundamental nature of the attack on the authority of the Forest

---

1984) (reversing the denial of an inventor's motion to intervene as of right, because the patent holder, against whom summary judgment had been granted, chose not to appeal; therefore, the inventor's purpose for intervention supported a finding of timeliness). Given the circumstances actually presented, however, appellants identify no critical purpose left unmet.

[13]The plaintiffs' litigation efforts in this and related cases have been supported by the Mountain States Legal Foundation.

"absolute measures of timeliness should be ignored"). A more critical factor is what steps occurred along the litigation continuum *during* this period of time. In the instant case, when the appellants moved to intervene, discovery was closed, the experts were producing their reports, and the court's previously-identified "finish line" – final disposition of a case on an expedited track should occur nine to twelve months after the date the complaint is filed – was fast approaching. The particular circumstances of the cases cited by the appellants are all easily distinguishable. *E.g.*, *Mountain Top Condo. Assoc. v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 370 (3rd Cir. 1995) (allowing intervention as of right where four years had passed between the filing of the complaint and the motion to intervene, but "there were no depositions taken, dispositive motions filed, or decrees entered during the four year period in question"); *Usery v. Brandel*, 87 F.R.D. 670, 675 (W.D. Mich. 1980) (intervention as of right was allowed where ten months had passed between the filing of the complaint and the motion to intervene, but the suit had "not advanced beyond early discovery").

Simply, the litigation had made extensive progress in the district court before the appellants moved to intervene. This factor weighs strongly in favor of the appellees.

## B. The Purposes for Which Appellants Sought Intervention.

Appellants identify three purposes behind their motion to intervene: (1) to ensure that their arguments, which they characterize as different from those of the Federal Defendants, are before the court; (2) to ensure that their different concerns are protected in the event of settlement out of court; and (3) to enable them to fully participate in the litigation, by filing motions and appeals.

The appellants' first purpose, however, has clearly been met already – the district court *did* consider all of the arguments and evidence that appellants believed was critical, by virtue of appellants' having received the district court's permission

to submit a brief as amici curiae. Even if the appellants' concerns in this case were different from those of the Federal Defendants – a point we address below – the appellants have had a full opportunity to present those concerns to the district court. We have held, in other cases, that the concerns of an entity seeking intervention can be presented with complete sufficiency through such participation. *Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1225 (6th Cir. 1975) (affirming the district court's denial of a motion by the Ohio Civil Rights Commission for permissive intervention, noting that if "the Commission accepts the District Court's invitation to participate in the litigation as an amicus curiae," it would "afford the Commission ample opportunity to give the court the benefit of its expertise," and noting also that "the District Court apparently will receive and consider any admissible evidence that the Commission chooses to offer"); *Thornton v. East Texas Motor Freight, Inc.*, 454 F.2d 197, 198 (6th Cir. 1972) (affirming the district court's denial of the EEOC's motion to intervene permissively or as of right, but allowing the EEOC to participate as amicus curiae).[9] Appellants have not suggested that the district court in any way minimized or ignored their expressed concerns. Further, there is every likelihood that the appellants will be permitted to continue their participation as amici curiae during the related appeal of *Stupak-Thrall III*, just as they have been allowed to do in *Stupak-Thrall II*.

The appellants' second stated purpose is at once confusing and unrealistic. It is confusing because, although appellants argue they have different concerns than do the Federal Defendants, appellants do not explain how this can be so in the context of this particular case. This case is significantly different from *Stupak-Thrall II*, where the fundamental question was whether the Forest Service had *exceeded* the authority the parties all assumed it had. *See Stupak-Thrall II*, 988 F. Supp. at 1064 (holding that "[t]o the extent that

---

[9]Of course, we have also held that participation as amicus curiae was insufficient, necessitating allowance of intervention. *E.g.*, *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997).

Amendment No. 5 limits Plaintiffs' valid existing right to use gas powered motor boats on the surface of Crooked Lake, it *exceeds* the Forest Service's authority and is not in accordance with law") (emphasis added). Given that the question posed in *Stupak-Thrall II* was one of degree, one can see how the Federal Defendants and the appellants might have different stakes in that case.[10] In this action, however, the critical question is whether the Federal Defendants have *any* authority to regulate Crooked Lake *at all*.[11] With this action, the plaintiffs pray for a permanent injunction prohibiting the Forest Service from "including any portion of Crooked Lake within the boundaries of the Sylvania Wilderness Area," J.A. at 38 (amended complaint at 25), which would have the effect of completely eliminating the jurisdiction of the Forest Service over Crooked Lake. The views of the proposed intervenors and the Federal Defendants are in complete accord on this question – they flatly oppose any such ruling. The appellants' assertion that they must intervene to protect their "different" concerns is unsupported. When the district court granted summary judgment to the defendants, the appellants' concerns were met perfectly – no more and no less.[12]

---

[10]As noted above, for example, appellant Church disagrees with the Forest Service regarding the degree to which it should prohibit boating on Crooked Lake. The Forest Service might conclude a regulation allowing electric motorboats is appropriate, while Church might insist that motorboats of any kind should be prohibited. But Church and the Forest Service certainly agree that the Forest Service does, and should have, jurisdiction to regulate boating at all.

[11]It is for this reason that this Court has held in abeyance the related appeal in *Stupak-Thrall II*; a conclusion in *Stupak-Thrall III* that the Federal Defendants have no jurisdiction to regulate Crooked Lake would moot the question, raised in *Stupak-Thrall II*, of whether Amendment No. 5 exceeds the Forest Service's authority.

[12]Conceivably, the appellants' arguments with respect to this factor would carry more weight if, for example, the district court had entered summary judgment *against* the Federal Defendants, who then decided not to appeal. *See Triax Co. v. TRW, Inc.*, 724 F.2d 1224, 1228 (6th Cir.